**Luis Albert ALKABALA–SANCHEZ,
Appellant**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

No. 2006–SC–000196–MR.

Supreme Court of Kentucky.

June 19, 2008.

Randall L. Wheeler, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General, Clint Evans Watson, Assistant Attorney General, Criminal Appellate Division, Frankfort, KY, for appellee.

Opinion of the Court by Justice
NOBLE.

■ This case involves the single issue of whether the trial court erred in denying Appellant's motion to suppress his confession. After the trial court denied the motion, Appellant, Luis Albert Alkabala–Sanchez, entered a conditional guilty plea to three counts of criminal conspiracy to commit murder and received a sentence of thirty years. Thus, he appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). Upon review of the totality of the circumstances of Appellant's interview during which he confessed, this Court concludes that he was not subject to custodial interrogation at the time he claims he was denied the warnings required under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court's order denying suppression is affirmed.

## I. Background

About five years ago, two fishermen found three adult male bodies floating along the banks of the Kentucky River in Clark County. The fishermen contacted law enforcement. Kentucky State Trooper James Devasher was dispatched to the scene and participated in a search of the area. During the search, he found a large pool of blood and a cell phone, which he later determined belonged to one of the victims.

Cell phone records from the phone located at the scene indicated the last calls were placed to a residence in Lexington, Kentucky, and to a cell phone registered to a person named Julio Camacho. About one week after the bodies were discovered, someone changed the billing address of the cell phone to a residence in Lakewood, New Jersey. Trooper Devasher requested surveillance at the New Jersey residence. Through that surveillance, he learned that a vehicle was parked at the house with a license plate from Clark County, Kentucky.

Five months after the bodies were discovered, Devasher went to Lakewood, New Jersey, to follow-up on the leads of the vehicle and the phone number. He spoke with two men at the residence who stated that they knew Camacho, but he did not live there. They gave Devasher the name of Luis Alkabala–Sanchez, the Appellant, and told him that Appellant was an associate of Camacho's in a prostitution ring. They gave Devasher Appellant's home address in New Jersey and informed him that he lived there with his sister and their uncle.

Devasher went to Appellant's house at about 2:30 p.m. with an agent from Immigration and Naturalization Service (INS) and an Ocean County sheriff's deputy, who served as an interpreter. When the sister arrived after about fifteen minutes, she denied knowing where Appellant was. The uncle arrived; and they asked him if he had a number where they could reach Appellant. In response, he pulled a small piece of paper from his pocket with a phone number on it that Devasher recognized immediately as one of the phone numbers from the victim's cell phone. Devasher took the uncle to the police station to interview him where he maintained that he did not have Appellant's current phone number, but that the sister did. Devasher returned to the sister's home with the INS agent and the sheriff's deputy/interpreter. After much urging, they convinced the sister to call her brother and arrange for an interview. She was upset when she called her brother and did not want the police to talk to him. By this time, it was between 9:00 and 10:00 p.m.

At the time, Appellant was working on a farm that was about twenty to thirty minutes away, and he did not have trans-

portation. Devasher, the INS agent, the sheriff's deputy, and three other law enforcement officers went in two unmarked police vehicles to where Appellant had agreed to meet them. Everyone was in plain clothes, and Devasher, at least, was armed. The sister and uncle accompanied the officers, and Devasher stopped on the way to meet Appellant and bought dinner for them. Appellant was waiting for them on the side of the road where Devasher informed him that he was from Kentucky and that he needed to talk to him about something that may have happened there. He said that he needed to find out if Appellant knew where a certain individual was. Appellant agreed to go to the police department and give an interview.

After picking up Appellant, the officers took him, the uncle and sister to the police department. Devasher was not certain in which vehicle the sister was riding, but the uncle did not ride in the same vehicle as Appellant, who spoke only Spanish.

At the police department, the uncle went to a lounge area while Devasher took Appellant to an interview room. At some point, one of the other officers took the sister home. Devasher, the INS agent, and the deputy/interpreter were present in the interview room with Appellant. Devasher recorded the interview on a cassette recorder because the video equipment in Lakewood was not working for recording purposes, but did work for monitoring purposes so that the other police officers monitored the interview which began at 10:47 p.m. At the beginning of the interview, Devasher informed Appellant that he was free to leave and that he did not have to talk to them. Throughout the interview, they took several breaks during which he was free to use the bathroom, buy drinks and to spend the break time with the other officers in the detective work room next to the interview room. At

1:20 a.m., the first interpreter had to leave, and a second interpreter, also a law enforcement officer, took over.

Appellant admitted toward the beginning of the interview that he had been in Kentucky. Devasher asked him if he lived at the Lexington address and if Julio Camacho lived at that address. Before receiving the *Miranda* warnings, he told Devasher that "Pelon" (nickname for Julio Camacho) had killed the three individuals. He told him how "Pelon" had killed them and disposed of their bodies, but claimed he learned the details from Julio Camacho's wife after the murders. However, he then told Devasher that he saw the blood and what "Pelon" had instructed him to do before, during, and after the murders, including that "Pelon" had told him to hide and not talk to the police. He stated that he knew why Devasher was there.

Based on those statements, it became clear to Devasher and the other officers that Appellant was involved in the murders. At 4:02 a.m., Devasher gave the warnings required under *Miranda*. After that, Appellant continued to speak with the officers for another two hours, the interview concluding at about 6:00 a.m. At that time, he admitted to assisting with the planning of the murders and the disposal of the bodies.

Appellant waived extradition to Kentucky. Two months later, he was charged with three counts of murder, either alone or in complicity with another, and tampering with evidence. During the course of his criminal proceedings, he filed a motion to suppress the statements he gave in the New Jersey interview. The focus of the suppression hearing was (1) whether Appellant was in custody from the start, triggering the requirement of giving the *Miranda* warnings at the beginning of the interview, (2) whether the statement was voluntary or coerced, and (3) the accuracy

of the interpretation by the New Jersey interpreters.

The suppression hearing was delayed for some time to allow for the completion of a transcript of the tapes and a translation of all Spanish excerpts to English. When completed, the transcript encompassed at least two hundred pages. Although the trial court had a copy of the transcript for the purpose of deciding the suppression motion, it is not part of the record.

The actual suppression hearing spanned three dates and consisted of testimony from three witnesses: Trooper Devasher, Doris Caspani, the person who transcribed and translated the interview, and Appellant. The only exhibit introduced at the suppression hearing was a waiver of rights form, written in Spanish and signed by Appellant at 4:02 a.m.

The background above is based on Devasher's testimony at the suppression hearing. Appellant's suppression hearing testimony, however, was that the police came looking for him at the farm. He believed that his sister and uncle were under arrest in the other vehicle, and he did not have contact with his family members when the police picked him up. When his sister had called him earlier, she told him that the INS agent had threatened that they would take her children away from her.

Appellant further testified that he was never advised that he did not have to say anything, that he had the right to speak to an attorney, that whatever he said could be used against him in a court of law, or that he could stop answering questions at any time. This was apparently refuted by the transcript of the interview. He stated that about three hours into the questioning, Devasher appeared tense and stated that Appellant and his family would get a lethal injection. At that point, Appellant,

in his own words (as translated), understood the facts and "made himself be part of what happened." He believed that the police had taken his sister in handcuffs to the police station. He did not sign the waiver of rights form until one-half hour before the interview ended. On cross-examination, however, he admitted that he agreed to talk with the police and that they expressed appreciation that he was there talking with them, but he explained that the police had his sister and his uncle. In his mind, under those circumstances, he could not do anything but talk to them.

Ms. Caspani discussed particular instances of the first interpreter's translation that were inaccurate. For example, at the beginning, Devasher stated he appreciated Appellant's being there. The interpreter translated it as "he makes good use of you being here talking to us." In another instance, Devasher stated, "Help me out here." The interpreter translated it as, "He's going to help you." From the interview, Ms. Caspani opined that the first interpreter had "good survival skills" but could have done better. The second interpreter did much better than the first. Ms. Caspani criticized each interpreter's use of the informal "you," which could be interpreted in Spanish as talking down to Appellant. There were also several portions of the tapes that were unintelligible, particularly when Appellant would respond.

At the conclusion of the evidence portion of the suppression hearing, the trial court allowed the parties to brief the issue. In a later status hearing, the trial court denied the motion to suppress Appellant's statement. In support, it stated that he was not in custody before Devasher gave him the *Miranda* warnings, there was a point at which Devasher suspected that he was involved in the crimes, and then he advised him of his rights. The trial court conclud-

ed that Appellant understood those rights. By continuing the interview voluntarily, Appellant waived his rights. In support, the trial court stated that it had reviewed the transcripts of the interview and concluded that the translation was sufficiently reliable, and that it was apparent that Appellant understood the questions, the translation, and either responded appropriately or requested clarification.

## II. The trial court was correct in Its conclusion that the Appellant was not in custody before he received the *Miranda* warnings.

The issue on appeal is whether the Appellant was subjected to custodial interrogation before he was given the *Miranda* statement of rights. Under *Miranda*, exculpatory or inculpatory statements made by the defendant under custodial interrogation may not be used against him at trial unless procedural safeguards are given which are sufficient to secure the privilege against self-incrimination. 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694. This means that a defendant's statements may only be used against him if he knowingly makes the statements in the exercise of his free will. The main question here is whether Appellant was "in custody" when he made statements in an interview with a Kentucky State Police officer in New Jersey. The question of "custody" is reviewed de novo on the application of the law to the facts, though the trial court's findings of historical fact are conclusive if supported by substantial evidence. *Thompson v. Keohane*, 516 U.S. 99, 100–03, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.1998) ("The issue of whether the defendant was 'in custody' is a mixture of law and fact, and is thus reviewed *de novo*.").

The trial court, after a hearing which occurred over three dates, concluded that Appellant was not in custody prior to being given the *Miranda* warnings. A transcript of the interview in New Jersey, which was over two hundred pages long, was reviewed. The interrogating officer, Devasher, and Appellant testified as to the facts. Doris Caspani, the interpreter who translated the transcription of the interview, which contained several responses in Spanish due to Appellant's inability to speak English, testified to the interpretations made to Appellant by the two interpreters used during the interview. There was a substantial amount of evidence before the trial court upon which to base his conclusion, including briefs by each party which the trial court took under submission and considered before issuing his findings orally at a subsequent status hearing. Unfortunately, not all of that evidence is in the record. While the testimony and the trial court's findings were recorded, a copy of the transcript of the interview was not entered into evidence, and apparently cannot be found. This transcript would have allowed for a more thorough review of the trial court's conclusions. Anything that is viewed or relied upon by the trial court must be made a part of the record. Not doing so thwarts the most complete review by an appellate court. Trial courts should note this and strive to ensure that any such documents are placed in the record. Nonetheless, it is the litigants who are responsible for ensuring that all appropriate evidence is in the record, and when they do not, this Court must show deference to the trial court's findings, as he is in the best position under such circumstances to know what the evidence actually was. *Cf. Clark v. Commonwealth*, 223 S.W.3d 90, 102 (Ky.2007) ("[W]e have consistently and repeatedly held that it is an appellant's responsibility to ensure that the record contains all of the materials necessary

for an appellate court to rule upon all the issues raised. And we are required to assume that any portion of the record not supplied to us supports the decision of the trial court." (citations omitted)). In his findings, the trial court specifically found that he had reviewed the transcript, that Appellant understood the questions and the translation, and that he responded appropriately to the questions or asked for clarification.

While Appellant and Devasher told significantly different stories about how the interview came about, the trial court had the opportunity to weigh the credibility of each witness, and to determine what he believed. The trial court stated that, based on the interview transcript which he found to be sufficiently reliable, there came a point where Devasher suspected that Appellant was involved, and that is when Devasher gave the *Miranda* warnings. Further, the trial court found that Appellant waived his rights when he continued giving a statement after the warnings. While the trial court did not give a lengthy recitation of the facts upon which it relied, his conclusions are amply supported by evidence in the record.

Upon discovering one of the victim's cell phone, Devasher had an opportunity to follow a trail of information. When the phone billing address changed to Lakewood, New Jersey, this was consistent with flight after a crime, and warranted surveillance of the New Jersey address. Another piece of information came from that: a car parked at the residence had Clark County, Kentucky license plates. Following up on this information, Devasher went to the address in New Jersey, where two men there knew the suspect, Camacho, but denied that he lived there. Instead, they told the officer of an associate of Camacho's, the Appellant, and where they thought he lived. Pursuing the lead, Devasher, a local deputy sheriff who spoke Spanish, and an INS officer went there, where the Appellant's sister and uncle soon arrived.

Appellant's sister denied knowing where he was, but his uncle gave Devasher a phone number which he recognized as one of the numbers on the victim's cell phone. It is obvious that at this point there was "hot pursuit" of evidence, which seemed to increase with each contact. The uncle was taken to the police station for questioning, and though he denied knowing another phone number for Appellant, he admitted that the sister did. This sent Devasher back to the sister's residence. At this point, the uncle and sister had successfully stonewalled the officers for a lengthy time. Once they returned to the sister's residence, she did call Appellant, after much urging. She was upset, did not want the police to talk to Appellant, and apparently insisted on relaying the message to her brother. By that time, it was getting late, but given the difficulty in contacting Appellant, continuing with an attempt to talk to him that night was reasonable.

Since Appellant did not have transportation, Devasher, the deputy sheriff, the INS agent, three other policemen, and the sister and uncle went to see Appellant, who had agreed to meet them on the side of the road at his work place which was 20 to 30 minutes from the sister's residence. Traveling in two unmarked cars and in plain clothes, Devasher and the others found Appellant where he said he would be. He obviously did not have to be there, and could have refused to meet with the officers. Rather than interview him by the roadside, Devasher logically asked him to accompany him to the police station, and told Appellant who he was and why he was

there. Appellant agreed to go to the station to talk.

At the beginning of the interview, Devasher told Appellant he was free to leave and did not have to talk to them. The trial court, having benefit of the transcript, found that Appellant understood this and gave appropriate responses. At all times an interpreter was present, and the trial court, again with benefit of the transcript, found that any faults in interpretation were not material. Appellant voluntarily remained. Throughout the rest of the interview, Appellant was free to take breaks, go to the bathroom unattended, buy soft drinks from the drink machine and move about. When he did not understand something, he asked for clarification.

When Appellant admitted knowing Camacho and about the murders, he led the officers to believe that he had been told about it by Camacho's wife. At this point, he was clearly being interviewed for information alone, as a witness, not as a suspect. Devasher testified that he had not even heard Appellant's name until he got to New Jersey. But sometime during the course of the evening, Appellant began to talk too much, and to make statements not consistent with second-hand information. When he began talking about what he knew or saw, Devasher stopped the interview and gave Appellant his *Miranda* warnings. From that point forward, for the next two hours, Appellant was in a custodial interrogation. The trial court was not in error when it found that, having been warned, Appellant waived his rights by continuing the interrogation. Again,

having benefit of the transcript, the trial court was in the best position to judge the voluntariness of Appellant's statements throughout the interview.

Further, the facts of this case do not support a finding that Appellant was subjected to a "question first" technique as described in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), where the defendant was questioned extensively so that he confessed before being given *Miranda* warnings and questioned again. As the Supreme Court plurality found in *Seibert*, the facts of the case must determine if *Miranda* warnings are effective in accomplishing their purpose when they are given. Here, the Appellant had been telling a story as if it were told to him by Camacho's wife, but interspersed statements that indicated personal knowledge. He was then given his *Miranda* warnings, and did not confess to his participation until after that, which he did voluntarily by continuing the interview for two more hours. As Justice Kennedy noted in his separate concurring opinion,[1] the "question first" technique should only be suppressed when it is employed in bad faith in a "calculated way to undermine the *Miranda* warning." *Id.* at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring). Devasher began the interview under the assumption that Appellant was simply a witness with knowledge of the crime, and as soon as it became clear that Appellant was involved, he gave the *Miranda* warnings. Devasher's actions do not demonstrate an attempt to bypass *Miranda* and were done in good faith.

1. Justice Kennedy's separate opinion is arguably controlling under *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), since it favors a narrower application of *Miranda* to two-step interrogations. Justice Breyer articulated a similar standard in his own concurring opinion, and Justice Kennedy's "opinion insofar as it is consistent with this approach and makes clear that a good-faith exception applies." *Seibert*, 542 U.S. 600, 618, 124 S.Ct. 2601, 2614, 159 L.Ed.2d 643 (Breyer, J., concurring).

There was clearly a more than sufficient basis for the trial court to form the conclusions it did, and there was no abuse of discretion in the findings it made. Moreover, in light of the totality of the circumstances surrounding the interview, this Court concludes that Appellant was not in custody during the first part of the interview, and when the questions pointed to a need for Appellant to be in custody, the *Miranda* warnings were properly given.

### III. Conclusion

Based on the analysis above, the judgment of conviction and sentence of the Appellant are affirmed.

LAMBERT, C.J.; ABRAMSON, CUNNINGHAM and SCOTT, JJ., concur.

MINTON, J., dissents because all of the relevant circumstances (including the presence of multiple officers, the time of day of the interview, the length of the interview, the isolation of Appellant from his family members before and during questioning, and the language barrier between Appellant and the officers) have caused him to conclude that Alkabala–Sanchez was in custody from the beginning of his interview with the police.

SCHRODER, J., dissents without separate opinion.