RENDERED:  MAY 2, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1107-MR

ELLIS D. GORE                                                APPELLANT

v.          APPEAL FROM JEFFERSON CIRCUIT COURT
            HONORABLE SARAH E. CLAY, JUDGE
            ACTION NO. 21-CR-000512

COMMONWEALTH OF KENTUCKY                                      APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CETRULO, COMBS, AND LAMBERT, JUDGES.

LAMBERT, JUDGE:  Pursuant to his conditional guilty plea, Ellis Gore challenges the Jefferson Circuit Court's denial of his motion to suppress his statements to law enforcement.  We reverse and remand.

In January 2021, authorities found a person named Jordan Diaz-Pino dead in a car from a gunshot wound.  Gore went to a hospital with a non-life-threatening gunshot injury around the same time.  Gore had Jordan's ID in his pocket at the hospital.

Chris Rutherford, the Louisville-Metro Police Department detective assigned to Jordan's shooting, called Gore and asked if they could have a conversation. Gore agreed. On the day after the shootings, Detective Rutherford and another officer went to Gore's home, and the three men drove to the crime scene in the detective's unmarked official vehicle. The officers did not frisk or handcuff Gore, who was eighteen at the time, and allowed him to ride in the front seat. The detectives were armed, but there is no indication they brandished their weapons.

The officers did not read Gore his *Miranda*[1] rights before their conversation. In fact, neither officer informed Gore of his *Miranda* rights at any point during the roughly two hours he was in Detective Rutherford's vehicle. Similarly, Detective Rutherford did not tell Gore that his participation in the conversation was voluntary and could end whenever Gore wished.

The record before us contains a transcript of the recorded conversation in the vehicle between the officers and Gore. Neither Gore nor the Commonwealth contests the transcript's accuracy in their briefs. Thus, we utilize it in this Opinion, along with the testimony presented at the suppression hearing. We shall relate the conversation between Gore and the officers in Detective Rutherford's vehicle in

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

more detail than we usually deem necessary to show the entire circumstances underlying our conclusion that Gore was in custody.

Though he did not express reluctance to answer questions, Gore's version of events was obviously changing and inconsistent. Initially, Gore stated Jordan, who was Gore's friend, had picked up Gore from a female's house with (unbeknownst to Gore) a backpack full of marijuana. According to Gore, Jordan's vehicle was quickly ambushed by two armed persons firing weapons. Gore said that he was shot and then jumped from the vehicle and began to run away. Gore maintained he had tried to call his mother and, after running awhile, had received a ride to the hospital from a stranger.

Seemingly seizing on Gore's comments about having placed a call, Detective Rutherford said he wanted to "get in" Gore's phone. Soon thereafter, Detective Rutherford explained self-defense principles under Kentucky law to Gore and told Gore he needed to "be honest about what happened in that car." Shortly afterwards Detective Rutherford told Gore: "And I know you shot that gun, I guess is what I'm trying to tell you . . . . But I need to – I need to know the truth. You know what I'm saying? Because when we find these guys, they're going to tell me that you were shooting at them."

Gore then began to change his version of events. Gore said he and Jordan had stopped to obtain marijuana whereupon other people began shooting at

Jordan's car, after which Jordan then grabbed a gun of his own and threatened to kill Gore. Gore admitted he shot Jordan after wresting the gun from him.

When Detective Rutherford asked what Gore had done with the gun, Gore said he had thrown it out at a location which he could not recall. Gore maintained that he did not know the name or address of the stranger who gave him a ride to the hospital. Detective Rutherford asked Gore why Jordan's ID was in his pocket at the hospital. Gore responded that he was trying to call someone for help with Jordan's phone because his (Gore's) phone was dead, and Jordan's ID was in his phone case. Gore soon admitted he had noticed a gun in Jordan's car upon entering it.

A little while later, Detective Rutherford said he would "have to write a search warrant on this – on your phone, okay? . . . We'll use a code breaker to get into it or, if that doesn't work, then I'll have to send your phone off to get destroyed and they pull the memory card out of it." Gore then gave the passcode for his phone to Detective Rutherford.

Gore then related that he had helped arrange a marijuana buy. According to Gore, he had been a middleman who had arranged for a friend, whom Gore referred to as his brother, to meet Jordan to buy several pounds of marijuana, but Gore's "brother" "didn't even show up." Gore then admitted that his "brother"

had given him a ride to the planned drug buy, even though he had recently said his "brother" had not shown up.

Soon thereafter, Detective Rutherford accurately noted that Gore's version of events was inconsistent. Detective Rutherford then told Gore that he was going home that night and would not be arrested. Gore soon admitted he had lied when he had stated earlier that Jordan had gone into a house to get marijuana and that the marijuana actually had been in Jordan's car all along.

Detective Rutherford again asked Gore how he had possessed Jordan's phone. When Gore maintained he had gotten Jordan's phone and his ID happened to have been in the back of his phone case, Detective Rutherford said, "[t]hat makes no sense." Gore then admitted he had not wanted to leave Jordan's phone in the vehicle because Gore's blood and fingerprints were on the phone. Gore again stated he had thrown Jordan's phone when running away from the shootings but did not recall where.

Soon Gore said he had called his girlfriend and his father from the phone of the stranger who gave him a ride to the hospital. After calling Gore's girlfriend and father, Detective Rutherford obtained the stranger's phone number and called him. The stranger said Gore had appeared at his home, the address of which the stranger provided to Detective Rutherford. Upon learning the stranger lived roughly two miles from where the shootings had occurred, Detective

Rutherford exclaimed to Gore: "You didn't run two miles!" Soon thereafter, the other officer told Gore that the stranger's home was in the opposite direction of the way Gore claimed to have run after shooting Jordan.

When Gore persisted in saying he did not recall where he had thrown the gun, Detective Rutherford said he did not want Gore "catching a murder charge on a kid killing themselves or their little brother or sister" with that gun. After some more questions to Gore about whether certain houses were where Gore had disposed of the gun, the other officer said: "I kind of think we're wasting our time looking for this gun, because I'm thinking that somebody picked you up after all this happened and dropped you off somewhere, and that's how you got closer to [the stranger's] house. And . . . whoever picked you up has got that gun." When Gore maintained that he had thrown the gun, the other detective expressed disbelief and then remarked, "let's quit wasting our time . . . let us know that it's just in somebody's car."

When Gore did not agree, Detective Rutherford soon remarked: "You can end up getting charged with murder if you're not honest, all right? And I'm not so sure that that might not happen in the long run anyways if you're not going to be honest with me." Gore then contradicted himself, again, and admitted he had been given a ride and dropped off near the stranger's house.

A little while later, Detective Rutherford again told Gore that his phone would be searched and if, during the search, the authorities "find anything on there that you're being dishonest about, there's a good chance that you could get charged with murder and robbery, okay?" Gore then admitted Jordan and the "brother" had used Gore's phone to contact each other about setting up the marijuana sale. Gore also admitted he had previously bought marijuana from Jordan. Detective Rutherford then got Gore to admit that he had been armed with a gun when he had entered Jordan's vehicle. The detective shortly thereafter said to Gore: "So I mean you knew this was a robbery from the beginning."

A little bit later, this exchange occurred:

DETECTIVE RUTHERFORD: Okay. Here's a thing I need to know. Do you want to go to jail tonight?

ELLIS GORE: No, sir.

DETECTIVE RUTHERFORD: Okay. I need the absolute honest truth about what happened in that car.

ELLIS GORE: That's what happened. I –

DETECTIVE RUTHERFORD: I mean from the beginning to the end now with the absolute truth. Because there's one thing I've held back from you.

ELLIS GORE: What?

DETECTIVE RUTHERFORD: There was a dash cam in that car. Did you see that when you were in there?

ELLIS GORE: No, sir.

DETECTIVE RUTHERFORD: So this is your last opportunity to tell me the 100 percent truth, because I mean you [have] been lying nonstop. I'm trying to be patient with you.

Though Detective Rutherford insists his statement about a camera having been in Jordan's car was designed to get Gore to tell the truth, Detective Rutherford admitted at the suppression hearing his statements about the presence of a camera in Jordan's car were lies.

After Detective Rutherford's dash camera statements, Gore said his "brother" was supposed to buy four pounds of marijuana from Jordan but when Gore, his "brother," and two unnamed accomplices arrived, the accomplices said they would kill Gore if he did not rob Jordan. Gore later said the accomplices shot into Jordan's car soon after Gore entered it, wounding Gore.

Very soon thereafter, Detective Rutherford said:

Here's what we're going to do. We're going to go by my office, you're going to tell me the 100 percent truth about what happened, all right? I'm going to make sure that code you gave me works on your phone, all right? And – and then we're going – we're going to go back to your house, all right?

After Detective Rutherford asked Gore to clarify an inaudible response, Gore asked: "Do I get to go home?" Detective Rutherford responded simply, "Did I tell you you're going home?"

Gore then asked if he would get to take his phone home that night, to which Detective Rutherford somewhat nonresponsively replied, "[n]o, because we're going to be – I mean – again, there's a dash cam in that car. That's how I know you've been lying to me this entire time, right? So you go in there and you tell me the 100 percent truth, you're going home . . . ."

Gore then went to Detective Rutherford's office. At that point, Detective Rutherford informed Gore of his *Miranda* rights. Afterwards, Gore essentially repeated his prior incriminating statements about his involvement in robbing and killing Jordan. Thereafter, as promised, Detective Rutherford took Gore home.

A couple of days later, Gore was arrested and charged with having murdered and robbed Jordan. Gore filed a motion to suppress statements he made in Detective Rutherford's vehicle and those he made in the detective's office.

At the hearing on Gore's motion, Detective Rutherford testified that initially he had viewed Gore only as a shooting victim, not a suspect. Detective Rutherford admitted his suspicions of Gore's involvement in Jordan's death grew as their conversation progressed. The detective stressed that he had kept his promise to Gore to take him home that night.

Detective Rutherford also admitted he had never told Gore that he could leave the car upon request, though the detective insisted that had been the

case. Detective Rutherford agreed with Gore's counsel that he (the detective) had used an interrogation technique counsel referred to as "*Miranda* in the middle." Essentially, that technique involved eliciting incriminating statements from Gore before informing him of his rights under *Miranda*, thereafter informing Gore of those *Miranda* rights, and then getting Gore to repeat his prewarning statements.

The trial court denied Gore's motion to suppress. Gore and the Commonwealth then reached a conditional plea agreement which called for Gore to receive a total of fifteen-years' imprisonment while retaining the right to appeal the denial of his motion to suppress. Gore filed this appeal after the trial court sentenced him in accordance with the agreement.

"We have considered the parties' extensive arguments and citations to authority but will discuss only the arguments and cited authorities we deem most pertinent, the remainder being without merit, irrelevant, or redundant." *Schell v. Young*, 640 S.W.3d 24, 29 n.1 (Ky. App. 2021). Also, the issuance of this Opinion was substantially delayed by the generous extensions of time we granted both parties to submit their briefs.

The issue for this Court to decide is whether the trial court properly denied Gore's motion to suppress. That overarching issue has two distinct parts: a) should the statements Gore made prior to receiving *Miranda* warnings be

suppressed and b) should the statements he made after receiving those warnings be

suppressed?

> When reviewing a trial court's ruling on a motion to suppress:
>
>> First, we determine whether the trial court's findings of fact are supported by substantial evidence. Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men. If the trial court's findings are supported by substantial evidence, they are considered conclusive. [W]e must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law. In particular, [t]he question of custody is reviewed de novo.

*Bowman v. Commonwealth*, 686 S.W.3d 230, 240-41 (Ky. 2024) (internal

quotation marks and citations omitted) (brackets in *Bowman*).

We begin with Gore's prewarning statements. "The warnings

required by *Miranda . . .* only apply when a person is in custody." *Ellis v.*

*Commonwealth*, 694 S.W.3d 294, 300 (Ky. 2024). Thus, the question is whether

Gore was in custody when he made the prewarning statements. "The [custodial]

test is whether, considering the surrounding circumstances, a reasonable person

would have believed he or she was free to leave." *Commonwealth v. Lucas*, 195

S.W.3d 403, 405 (Ky. 2006). Because the test is based on the perceptions of a

hypothetical reasonable person, determining whether a person was in custody

"depends on the objective circumstances of the interrogation. The subjective view

-11-

of the officer and the person being questioned are not the focus of the [custodial] question." *Id.* at 406 (citations omitted).

There is no universal test which can be mechanically applied to determine whether a person was in custody; instead that determination must be made on a case-by-case basis. *Jackson v. Commonwealth*, 187 S.W.3d 300, 310 (Ky. 2006). Our Supreme Court has provided the following factors to consider in determining whether a person was in custody:

> [L]ocation of interview; number of officers present; the demeanor of the officers during the interview, including their tone of voice and nature of questions; the display of weapons; physical touching of the suspect; whether the suspect was handcuffed or otherwise restrained; statements made during the interview; length of interview; and whether the suspect was released or arrested after the interview. *Hernandez v. Commonwealth*, 671 S.W.3d 217, 224 (Ky. 2023).

*Ellis*, 694 S.W.3d at 300. Ultimately, the Commonwealth bears the burden to show that Gore was not in custody. *Hernandez*, 671 S.W.3d at 224.

Before we analyze those factors, we must explain why we will not utilize the additional factors Gore discusses. First, Gore addresses at length "whether strong arm tactics or deceptive stratagems were employed during questioning[.]" Gore asserts that purported factor is included in *Welch v. Commonwealth*, 149 S.W.3d 407 (Ky. 2004). However, the dissent in *Welch*, not the majority, discussed the deceptive stratagems factor.

-12-

Gore cites no additional Kentucky precedent listing deceptive stratagems as a custodial factor. Indeed, though authorities are not permitted to lie "about the rights protected by *Miranda* and the legal effects of giving up those rights[,]" Kentucky precedent holds that "[a]rtful deception is an invaluable and legitimate tool in the police officer's bag of clever investigative devices . . . ." *Leger v. Commonwealth*, 400 S.W.3d 745, 750 (Ky. 2013).

Moreover, our Supreme Court has not listed deceptive stratagems as a custodial factor in its many recent opinions on this topic. *See, e.g.*, *Ellis*, 694 S.W.3d at 300; *Hernandez*, 671 S.W.3d at 224; *Bowman*, 686 S.W.3d at 241; *Simpson v. Commonwealth*, 653 S.W.3d 855, 862 (Ky. 2022); *Haney v. Commonwealth*, 653 S.W.3d 559, 564 (Ky. 2022). Indeed, the United States Supreme Court has stated that an officer's lie to a suspect "has nothing to do with whether respondent was in custody for purposes of the *Miranda* rule." *Oregon v. Mathiason*, 429 U.S. 492, 496, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977). Therefore, we decline to add deceptive stratagems to the list of proper factors.

Also, though the parties discuss it, Gore's lack of experience with law enforcement is irrelevant to the objective determination of his custodial status. *Yarborough v. Alvarado*, 541 U.S. 652, 668, 124 S. Ct. 2140, 2151, 158 L. Ed. 2d 938 (2004). Similarly, we decline to focus on Gore's age (18) at the time he made the statements he wishes to suppress. The age of a child (*i.e.*, someone who has

-13-

not reached the age of legal majority) is a proper factor to consider in making a custody determination. *J.D.B. v. North Carolina*, 564 U.S. 261, 281, 131 S. Ct. 2394, 2408, 180 L. Ed. 2d 310 (2011). But Gore was not a child. *See* Kentucky Revised Statute (KRS) 2.015 ("Persons of the age of eighteen (18) years are of the age of majority for all purposes in this Commonwealth except for the purchase of alcoholic beverages and for purposes of care and treatment of children with disabilities . . . ."). Gore was a legal adult, with the rights and responsibilities which come along with that status.

Turning to the relevant factors, it is readily apparent that, as often occurs, some favor a conclusion that Gore was in custody and some do not. In such situations, our Supreme Court focused on "the weight of the evidence . . . ." *Beckham v. Commonwealth*, 248 S.W.3d 547, 553 (Ky. 2008). Here, we conclude the weight of the evidence leads to a conclusion that Gore was in custody.

The fact that the officers did not display their weapons to Gore, touch Gore, handcuff Gore (who rode in the front seat of Detective Rutherford's unmarked vehicle), or arrest Gore immediately after the interrogation ended, all weigh in favor of a conclusion Gore was not in custody. The Commonwealth also emphasizes that Detective Rutherford told Gore that he was not going to be arrested and would be taken home that night. However, the transcript does not depict Detective Rutherford as having provided that information to Gore until an

hour or thereabouts into the interrogation, by which point Gore had made incriminating statements. And even then, Detective Rutherford said Gore could go home only if he told the complete truth about Jordan's death.

On the other hand, Gore made his prewarning statements while riding in a moving police vehicle along with two armed officers. That small, closed environment is inherently coercive. It is beyond reasonable debate that it is more difficult to leave a moving, closed vehicle than it would be to walk away from a discussion occurring in a public, stationary location.

Of course, the fact that questioning occurred in a police vehicle is "not dispositive." *Simpson*, 653 S.W.3d at 863. However, *Simpson* is distinguishable. First, the police vehicle in *Simpson* was not moving and a passenger door was open. *Id.* at 862. A stationary vehicle with an open door is less inherently coercive than a moving vehicle with its doors closed. Also, the interview in *Simpson* lasted only about nine minutes and consisted of "general questions . . . ." *Id.* By contrast, the officers interviewed Gore for two hours, and they asked him numerous pointed questions which had a high potential to elicit an incriminating answer. Also, unlike the case at hand, the police in *Simpson* "made clear that Simpson was free to leave at any time . . . ." *Id.* In sum, we conclude the questioning here occurred in a coercive location.

Next, though Detective Rutherford testified at the suppression hearing that he would have let Gore leave upon request, neither officer conveyed that freedom to Gore. The United States Supreme Court has noted that an officer having not told an interviewee that he was free to leave would support finding the interviewee was in custody. *Yarborough*, 541 U.S. at 665, 124 S. Ct. at 2150. *Accord Bowman*, 686 S.W.3d at 242 (holding that "the fact that Det. Eisenback did not tell him he was free to leave or stop questioning is a factor that cuts in favor of finding he was in custody . . .."). Similarly, an officer having expressly told an interviewee that she did not have to answer questions and could end the interview "at will" could make "all the difference" in a "close case . . . ." *United States v. Panak*, 552 F.3d 462, 467-68 (6th Cir. 2009). Here, the fact that Detective Rutherford did not tell Gore that his participation was voluntary, and that the interrogation would cease upon Gore's request, helps make "all the difference" in a case where there are factors supporting contrary conclusions regarding whether Gore was in custody.

The extended length of the interview also weighs in Gore's favor. A two-hour interview cannot reasonably be described as brief. In fact, the Supreme Court held that a two-hour-long interview weighed in favor of the interviewee's having been in custody. *Yarborough*, 541 U.S. at 665, 124 S. Ct. at 2150.

The Commonwealth attempts to minimize the length of the interrogation by citing our Supreme Court's conclusion that an interrogation which lasted "less than one hour and fifteen minutes" did not result in the interviewee's having been in custody. *Wells v. Commonwealth*, 512 S.W.3d 720, 723 (Ky. 2017). We agree that there is no rigid, fixed point past which an interrogation begins to weigh in favor of a determination that the interviewee was in custody. Indeed, some cases have held that an interrogation lasting more than two hours did not cause the interviewee to be in custody. *See, e.g.*, *Beckham*, 248 S.W.3d at 551.

However, the roughly seventy-five-minute interview in *Wells* cited by the Commonwealth was not even two-thirds as long as the roughly 120-minute interview at issue. Moreover, the questioning in *Beckham* occurred in segments and the interviewee was left alone at times, *Beckham*, 248 S.W.3d at 549-50. Here, the officers questioned Gore continually for two hours in Detective Rutherford's vehicle. Plus, our Supreme Court emphasized in *Beckham* that the officers "testified that they informed Beckham he was free to leave[,]" *id.* at 553, whereas the Commonwealth cites to no similar statement by Detective Rutherford, other than his promise well into the interview that Gore would go home that night – if he told the complete truth.

Finally, the nature of the questions weighs heavily in Gore's favor. Even before the questioning, Detective Rutherford knew Gore had possessed

-17-

Jordan's ID. Thus, there reasonably were underlying suspicions about Gore's involvement in Jordan's death prior to Detective Rutherford's asking Gore a single question.

Early on, Detective Rutherford mentioned wanting to obtain the information stored in Gore's phone and explained Kentucky's self-defense principles. Moreover, Detective Rutherford quickly said he knew Gore had fired the gun which killed Jordan. That statement does not logically align with Detective Rutherford's testimony that he initially viewed Gore as a mere shooting victim.

Of course, "[c]ustody does not materialize . . . merely because an interviewee admits to something potentially incriminating." *Peacher v. Commonwealth*, 391 S.W.3d 821, 847 (Ky. 2013). To the contrary, Detective Rutherford's unarticulated suspicions about Gore's role in Jordan's death would not transform an otherwise noncustodial interrogation into a custodial one. *Id.*

However, Detective Rutherford did not keep his suspicions to himself. He repeatedly told Gore that he believed Gore was lying. He told Gore it was entirely possible that he would be charged with murder. He (falsely) told Gore that there was camera footage of what occurred in Jordan's car. He told Gore that he had to tell the complete truth to avoid going to jail. He told Gore that his phone would be searched. In sum, the entirety of the interview shows that, from an

-18-

objective standpoint, Detective Rutherford expressed to Gore his suspicions about him. *Stansbury v. California*, 511 U.S. 318, 325, 114 S. Ct. 1526, 1530, 128 L. Ed. 2d 293 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."); *Hernandez*, 671 S.W.3d at 225 (holding that an officer's disclosure of his or her suspicions of guilt to the defendant "is relevant to a determination of whether the suspect is in custody . . .").

Overall, the entirety of the circumstances leads to a conclusion that a reasonable person in Gore's position would not have felt free to leave. Most relevant to our conclusion is that: Gore was questioned for two hours in a moving police car containing two armed officers; from the beginning, the officers asked questions and made comments indicating their suspicions about Gore's role in Jordan's death; Detective Rutherford stated multiple times that he would access the contents of Gore's phone; Detective Rutherford said that Gore's version of events did not make sense, that Gore had been lying during the entire conversation, and that Gore needed to tell the complete truth if he wanted to go home that night; and Detective Rutherford told Gore there had been a camera in Jordan's car.

A reasonable person in Gore's position would not have believed he or she was "at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465, 133 L. Ed. 2d 383 (1995). Thus,

Gore was in custody when he made his prewarning statements. Because Gore was in custody, he was entitled to be informed of his rights under *Miranda* prior to answering the officers' questions. Since the officers did not inform Gore of those rights before Gore made those statements, the trial court should have granted Gore's motion to suppress his prewarning statements.

We now turn to determining whether Gore's post-warning statements should be suppressed. The Commonwealth argues we should remand this issue to the trial court without resolving it on the merits because the trial court did not address the post-warning statements. We disagree.

The trial court denied the entirety of Gore's motion to suppress and simply held that Gore had been "*Mirandized* prior to giving the second statement." Although the trial court did not engage in substantive analysis, it did tersely address the issue by denying Gore's motion to suppress and noting the existence of *Miranda* warnings prior to Gore's making incriminating statements at Detective Rutherford's office. Therefore, we shall address suppression of the post-warning statements on the merits.

We begin by noting that, standing alone, the fact that Detective Rutherford informed Gore of his *Miranda* rights prior to Gore's making incriminating statements at the detective's office is not wholly dispositive – despite the trial court's holding to the contrary. Instead, Gore's post-warning statements

should have been suppressed due to Detective Rutherford's intentional usage of the "*Miranda* in the middle" technique, also known as the "question-first" technique.

As described by the Supreme Court, that technique involves officers' declining to give *Miranda* warnings "until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda* . . . , the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time." *Missouri v. Seibert*, 542 U.S. 600, 604, 124 S. Ct. 2601, 2605, 159 L. Ed. 2d 643 (2004) (plurality opinion).

No opinion in *Seibert* garnered a majority of the Court; thus, the separate concurring opinion of Justice Kennedy is controlling because it is based on the narrowest grounds. *Callihan v. Commonwealth*, 142 S.W.3d 123, 126 (Ky. 2004). As Justice Kennedy opined:

> [P]ostwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial

statement may be sufficient.

*Seibert*, 542 U.S. at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring) (citations omitted).

As interpreted by our Supreme Court, "post-*Miranda* statements obtained using the 'question-first' technique are only invalid where police deliberately employ the technique to circumvent the suspect's *Miranda* rights." *Callihan*, 142 S.W.3d at 125-26. In short, according to our Supreme Court, incriminating statements made under the "question-first" technique "should only be suppressed when it [the technique] is employed in bad faith in a calculated way to undermine the *Miranda* warning." *Alkabala-Sanchez v. Commonwealth*, 255 S.W.3d 916, 922 (Ky. 2008) (internal quotation marks omitted). That occurred here.

Frequently the question faced by a court confronting a motion to suppress based on alleged usage of the "question-first" technique is whether the officer intentionally used that technique to undermine *Miranda*. But that question is easily resolved here because Detective Rutherford readily admitted to having used the "*Miranda* in the middle technique" at the suppression hearing.

Additionally, Detective Rutherford did not employ "curative measures" before eliciting Gore's post-warning statements. *Seibert*, 542 U.S. at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring). For example, the

Commonwealth does not cite where the detective gave Gore an "additional warning that explains the likely inadmissibility of the prewarning custodial statement" nor has the Commonwealth pointed to "a substantial break in time . . . between the prewarning statement and the [giving of the] *Miranda* warning . . . ." *Id.* Instead, Detective Rutherford engaged in a prewarning "systematic, exhaustive" questioning of Gore, after which there "was little, if anything, of incriminating potential left unsaid." *Id.* at 542 U.S. 616, 124 S. Ct. 2612 (plurality opinion).

Accordingly, the trial court erred by denying Gore's motion to suppress his post-warning statements due to Detective Rutherford's intentional, improper usage of the "*Miranda* in the middle" interrogation technique.

For the foregoing reasons, the Jefferson Circuit Court is reversed, and the matter is remanded for further proceedings consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Rob Eggert
Tricia Lister
Louisville, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General
Frankfort, Kentucky